1

2

3

4

5

6

7

8                     IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   GARRY P. WATSON,

11               Plaintiff,                    No. CIV S-06-1475 LKK EFB P

12          vs.

13   J. TORRUELLA, et al.,

14               Defendants.            FINDINGS AND RECOMMENDATIONS

15   _____/

16          Plaintiff is a state prisoner proceeding without counsel in an action brought under 42

17   U.S.C. § 1983.  He proceeds on his April 27, 2007, amended complaint, wherein he alleges that

18   defendants Torruella, Galloway, and Milliman were deliberately indifferent to a medical

19   condition in plaintiff's right thumb, which was eventually diagnosed as a type of cancer --

20   squamous cell carcinoma.  On August 7, 2008, defendants filed a motion for summary judgment

21   on the ground that they were not deliberately indifferent to plaintiff's medical needs and that

22   they are entitled to qualified immunity.  The court has considered the moving and opposing

23   papers and concludes that defendants' motion for summary judgment should be granted.

24   **I.      Facts**

25          The following facts are undisputed, except as noted below.  Plaintiff is an inmate

26   incarcerated within the California Department of Corrections and Rehabilitation (CDCR).  At all

times relevant to this dispute, defendants Torruella, Galloway, and Milliman were employed by CDCR as physicians and surgeons.  Defs.' Mot. for Summ. J., Decl. of Torruella in Supp. Thereof ("Torruella Decl.") ¶ 2, Decl. of Galloway in Supp. Thereof ("Galloway Decl.") ¶ 2, Decl. of Milliman in Supp. Thereof ("Milliman Decl.") ¶ 2.

Each of the defendants saw plaintiff for a medical condition involving plaintiff's right thumb.  Am. Compl. at IV.  Specifically, plaintiff alleges that he "was seen in sequential order" by Torruella from "January 14, 2002 through May 28, 2003," then by Galloway "from May 28, 2004 through July 28, 2004," and finally, by Milliman, "on November 2, 2004."  *Id.*  According to plaintiff, defendants were deliberately indifferent to the medical condition in plaintiff's right thumb, in that they failed to properly diagnose and treat it, "regardless of the pain, sensitivity, swelling, disfigurement or disability," that plaintiff was experiencing.  *Id.*  Plaintiff further alleges that this "resulted in the development of cancer, which may require in the future amputation and permanent disability."  *Id.*

Torruella first saw plaintiff on or around January 14, 2002.  Torruella Decl. ¶ 4a. Plaintiff reported a problem with his right thumb, which he said began one month earlier.  *Id.*  He told Torruella that he used a cleaning solution at his job but did not use gloves.  *Id.*  Torruella observed that the skin at the base of plaintiff's right thumb nail was cracked with thickening of the skin.  *Id.*  Because the thumb condition appeared to be an infection, Torruella prescribed a triple antibiotic ointment for plaintiff to apply to the skin at the base of his right thumb nail.  *Id.* at ¶ 4b.  Based on Torruella's training and experience, most similar findings are secondary to a bacterial infection and his prescribed treatment is commonly used to resolve that condition.  *Id.* Torruella did not take a sample of plaintiff's right thumb tissue.  Pl.'s Opp'n (Docket No. 34), Pl.'s Decl. in Supp. Thereof ("Pl.'s Decl.") ¶ 1.

During this visit, plaintiff also complained of back pain and a skin condition on his chin caused by shaving.  Torruella Decl. ¶ 4a.  Based upon these complaints, Torruella ordered an x-ray of plaintiff's spine to rule out a bony spinal injury, prescribed Hydrocortisone cream for

1    plaintiff's chin, and gave plaintiff a two-week no shave chrono.  *Id.* at ¶ 4b.

2         Torruella next saw plaintiff on February 4, 2002.  *Id.* at ¶ 4c.  This time plaintiff said that

3    his thumb condition began over one year ago, and that it had not gotten better.  *Id.*  Plaintiff said

4    that he quit using the cleaning solution and now used gloves at work.  *Id.*  Torruella observed

5    that plaintiff's right thumb had what appeared to be chronic induration (e.g. was inflamed,

6    thickened, and tender) at the base of the thumb nail.  *Id.*  Torruella's opinion was that plaintiff

7    had a chronic bacterial infection of his right thumb nail.  *Id.*  In order to treat the infection,

8    Torruella prescribed a thirty day supply of Cipro, an antibiotic.  *Id.*  Oral antibiotics, such as

9    Cipro, are commonly prescribed to resolve bacterial infections such as what plaintiff appeared to

10   have.  *Id.*  Once again, Torruella did not take a sample of plaintiff's right thumb tissue.  Pl.'s

11   Decl. ¶ 2.

12        Torruella also saw plaintiff over one year later on May 28, 2003.  Torruella Decl. ¶ 4d.

13   Plaintiff said the thumb always throbbed and was painful when touched, and that the pain was 7

14   or 8 out of 10 when the areas was struck.  *Id.*  He said that the thumb had given him problems for

15   about two years.  *Id.*  Torruella observed some thickening of the middle edge of plaintiff's right

16   thumbnail with questionable lifting of the nail at that location.  *Id.*  There was also some

17   increased erythema (redness) and thickening of the skin at the nail's edge, especially at the base

18   of the nail.  *Id.*  Torruella still believed that plaintiff's thumb was chronically infected, as the

19   symptoms were still consistent with that condition.  *Id.*  Accordingly, Torruella gave plaintiff a

20   seven-day prescription for Motrin in order to reduce the pain and inflammation.  *Id.*  However,

21   the Motrin did not alleviate plaintiff's pain.  Pl.'s Decl. ¶ 5.  Torruella did not treat plaintiff after

22   May 28, 2003.  Torruella Decl. ¶ 4e.

23        Galloway initially saw plaintiff one year later, on or around May 28, 2004.  Galloway

24   Decl. ¶ 4a.  Galloway saw that plaintiff's right thumb had some separation of the cuticle from the

25   nail.  *Id.* at ¶ 4b.  There was no pus or redness however.  *Id.*  Galloway believed that plaintiff had

26   a fungal infection of the nail fold with candida, which is a type of yeast.  *Id.*  That diagnosis was

1   the most consistent with the observed chronic separation of the cuticle.  *Id.*  Galloway ordered

2   Clotrimozole, an antifungal cream, for the nail margin.  *Id.* at ¶ 4c.  Additionally, Galloway

3   ordered an x-ray of plaintiff's left shoulder in response to plaintiff's concurrent complaint

4   regarding chronic left shoulder pain.  *Id.* at ¶¶ 4a, 4c.

5        Galloway next saw plaintiff two months later on July 28, 2004.  *Id.* at ¶ 4d.  Galloway

6   observed that the cuticle of plaintiff's right thumb was swollen and tender and that there was

7   mild redness.  *Id.*  At this point, it appeared to Galloway that plaintiff's right thumb condition

8   was probably a tissue reaction to a foreign body such as a splinter or the nail itself, similar to an

9   ingrown toenail.  *Id.*  Galloway ordered a wedge excision of plaintiff's right thumbnail, a minor

10  surgical procedure, which was to be performed by a surgeon who Galloway believed was the

11  most accomplished surgeon on staff.  *Id.* at ¶ 4e.  Galloway expected that the surgeon would

12  provide a second opinion and intervention, if needed, to excise the nail, explore the foreign

13  bodies or biopsy the area if he believed it was necessary.  *Id.*  July 28, 2004 was the last time that

14  Galloway treated plaintiff for his thumb condition.  *Id.* at ¶ 4f.

15       Milliman saw plaintiff three months later on November 2, 2004.  Milliman Decl. ¶ 4a.

16  Plaintiff told him he had an ongoing, painful right thumb condition existing for approximately

17  one to two years and for which he had been seen by many doctors.  *Id.*  Milliman examined

18  plaintiff and found erythema surrounding a superficial crack or break in the skin at the base of

19  his right thumbnail.  *Id.*  The area was tender when Milliman pressed on it.  *Id.*  The nail bed

20  appeared normal.  *Id.*  Milliman assessed the right thumb condition as a chronic infection,

21  possibly a fungus.  *Id.* at ¶ 4b.  Milliman believed the "chronic subungual fungus infection"

22  probably had a chronic bacterial secondary infection.  *Id.*  Milliman ordered that he be given a

23  three week supply of Band-Aids and a triple antibiotic ointment.  *Id.* at ¶ 4c.  Milliman also

24  instructed plaintiff to keep the area covered 24 hours of day for the entire three week period.  *Id.*

25  Milliman expected the ointment to resolve any bacterial infection and that the conservative

26  sanitary care would mitigate any fungal infection.  *Id.*  If there were still signs of an active fungal

infection after more than three weeks, Milliman planned to prescribe an oral anti-fungal medication. *Id.* Such medication can cause severe, sometimes fatal, toxic reaction in the liver or kidney of some patients and should only be prescribed for severe fungal infections. *Id.* Before ordering such a prescription, Milliman therefore wanted to: (1) confirm that plaintiff did, in fact, have a severe enough fungal infection to warrant such a drug, and (2) to assess his liver and kidney health to determine if such a treatment could be safely given to him. *Id.* According to plaintiff, Milliman refused to renew plaintiff's pain medication at this visit. Pl.'s Decl. ¶ 11. Milliman did not treat plaintiff again after November 2, 2004. Milliman Decl. ¶ 4d.

Plaintiff had a biopsy and nail bed surgery on his thumb on February 4, 2005. Am. Compl. at IV; Pl.'s Decl. ¶ 12. The biopsy revealed a type of cancer, squamous cell carcinoma, which had not been completely excised. *Id.* In June 2006, plaintiff had surgery to excise the residual cancer cells in his right thumb. Am. Compl. at IV; Pl.'s Decl. ¶ 15. He claims that he continues, "to experience recurring episodes of extreme tenderness, swelling and pain of the right thumb" and that the surgeries resulted in disability and disfigurement. *Id.*

## II.   Summary Judgment Standards

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted).

Summary judgment avoids unnecessary trials in cases with no genuinely disputed material facts. *See Northwest Motorcycle Ass'n v. United States Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). At issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter

of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Thus, Rule 56 serves to

screen the latter cases from those which actually require resolution of genuine disputes over

material facts; *e.g.*, issues that can only be determined through presentation of testimony at trial

such as the credibility of conflicting testimony over facts that make a difference in the outcome.

*Celotex*, 477 U.S. at 323.

Focus on where the burden of proof lies as to the issue in question is crucial to summary

judgment procedures.  "[W]here the nonmoving party will bear the burden of proof at trial on a

dispositive issue, a summary judgment motion may properly be made in reliance solely on the

'pleadings, depositions, answers to interrogatories, and admissions on file.'"  *Id.*  Indeed,

summary judgment should be entered, after adequate time for discovery and upon motion,

against a party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial.  *See*

*id.* at 322. In such a circumstance, summary judgment should be granted, "so long as whatever is

before the district court demonstrates that the standard for entry of summary judgment, as set

forth in Rule 56(c), is satisfied."  *Id.* at 323.

If the moving party meets its initial responsibility, the opposing party must establish that

a genuine issue as to any material fact actually does exist.  *See Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To overcome summary judgment, the opposing

party must demonstrate a factual dispute that is both material, i.e. it affects the outcome of the

claim under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);

*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and

genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving

party.  *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).  In this

regard, "a complete failure of proof concerning an essential element of the nonmoving party's

case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.  In attempting to

establish the existence of a factual dispute that is genuine, the opposing party may not rely upon

the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  *See* Fed. R. Civ. P. 56(e); *Matsushita,* 475 U.S. at 586 n.11.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *T.W. Elec. Serv.*, 809 F.2d at 631.

Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).  However, the opposing party must demonstrate with adequate evidence a genuine issue for trial. *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142 (9th Cir. 1989).  The opposing party must do so with evidence upon which a fair-minded jury "could return a verdict for [him] on the evidence presented."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 252.  If the evidence presented could not support a judgment in the opposing party's favor, there is no genuine issue.  *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. at 323.

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  *See Anderson*, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  *See Matsushita*, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

1       On December 6, 2007, the court advised plaintiff of the requirements for opposing a

2  motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  *See Rand v. Rowland*, 154

3  F.3d 952, 957 (9th Cir. 1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v.*

4  *Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

5  **III.**    **Legal Standard for Eighth Amendment Claims**

6       In order to state a § 1983 claim for violation of the Eighth Amendment based on

7  inadequate medical care, plaintiff  must allege "acts or omissions sufficiently harmful to

8  evidence deliberate indifference to serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 106

9  (1976).  To prevail, plaintiff must show both that his medical needs were objectively serious, and

10  that defendants possessed a sufficiently culpable state of mind.  *Wilson v. Seiter*, 501 U.S. 294,

11  297-99 (1991); *McKinney v. Anderson*, 959 F.2d 853, 854 (9th Cir. 1992).  A plaintiff shows a

12  serious medical need by demonstrating that failure to treat the condition could result in further

13  significant injury or the unnecessary and wanton infliction of pain.  *Jett v. Penner*, 439 F.3d

14  1091, 1096 (9th Cir. 2006).

15       To act with deliberate indifference, a prison official must both be aware of facts from

16  which the inference could be drawn that a substantial risk of serious harm exists, and he must

17  also draw the inference.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Thus, a defendant is

18  liable if he knows that plaintiff faces "a substantial risk of serious harm and disregards that risk

19  by failing to take reasonable measures to abate it."  *Id.* at 847.  "[I]t is enough that the official

20  acted or failed to act despite his knowledge of a substantial risk of serious harm."  *Id.* at 842.

21  "Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of

22  action."  *Broughton v. Cutter Laboratories*, 622 F.2d 458, 460 (9th Cir. 1980) (citing *Estelle*,

23  429 U.S. at 105-06); *see also Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere

24  negligence in diagnosing or treating a medical condition, without more, does not violate a

25  prisoner's Eighth Amendment rights.").  Deliberate indifference is "a state of mind more

26  blameworthy than negligence" and "requires 'more than ordinary lack of due care for the

1   prisoner's interests or safety.'" *Farmer*, 511 U.S. at 835 (quoting *Whitley v. Albers*, 475 U.S.

2   312, 319 (1986)).  However, a physician need not fail to treat an inmate altogether in order to

3   violate that inmate's Eighth Amendment rights.  *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314

4   (9th Cir. 1989).  A failure to competently treat a serious medical condition, even if some

5   treatment is prescribed, may constitute deliberate indifference in a particular case.  *Id.*  However,

6   it is well established that mere differences of opinion concerning the appropriate treatment

7   cannot be the basis of an Eighth Amendment violation.  *Jackson v. McIntosh*, 90 F.3d 330, 332

8   (9th Cir. 1996); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981).

9   **IV.    Analysis**

10          Defendants argue that no genuine issues of material fact exist to show that any of them

11   acted with the necessary subjective mental state of deliberate indifference to support an Eighth

12   Amendment violation.  Defs.' Mot. for Summ. J., Mem. of P. & A. in Supp. Thereof at 14.  In

13   the alternative, they argue they are entitled to qualified immunity.  *Id.*  As discussed below,

14   defendants are entitled to summary judgment on the claims that they acted with deliberate

15   indifference to plaintiff's medical condition.

16          The record is clear that defendants had a difficult time determining the source of

17   plaintiffs thumb condition.  However, the record is replete with examples of defendants

18   attempting to treat the condition, not ignore it.  Torruella saw plaintiff three times.  At the first

19   visit, Torruella determined that plaintiff had a bacterial infection and prescribed an antibiotic

20   ointment, which is commonly used to treat bacterial infections.  Torruella Decl. ¶ 4b.  Torruella

21   also responded to plaintiff's complaints regarding two other medical issues.  *Id.*  Several weeks

22   later, when plaintiff's condition had not improved, Torruella determined that plaintiff had a

23   chronic bacterial infection and prescribed oral antibiotics, which are commonly prescribed to

24   resolve bacterial infections such as what plaintiff appeared to have.  *Id.* at ¶ 4c.  Over one year

25   later, at plaintiff's final visit with Torruella, Torruella prescribed plaintiff Motrin to reduce the

26   pain and inflammation, caused by what Torruella still believed to be a chronic bacterial

1    infection.  *Id.* at ¶ 4c.

2        Galloway saw plaintiff twice.  At the first visit, Galloway observed that plaintiff's right

3    thumb had some separation of the cuticle from the nail.  Galloway Decl. ¶ 4b.  The diagnosis

4    most consistent with the observed separation of the cuticle was a fungal infection.  *Id.*  Galloway

5    ordered an antifungal cream for plaintiff and also responded to plaintiff's complaints regarding

6    several other medical issues.  *Id.* at ¶ 4c.  At the second visit, two months later, it appeared to

7    Galloway that plaintiff's right thumb condition was probably a tissue reaction to a foreign body.

8    *Id.* at ¶ 4d.  Accordingly, Galloway ordered an excision of plaintiff's right thumbnail, which was

9    to be performed by another surgeon, who Galloway expected would provide a second opinion

10   and explore for foreign bodies or biopsy the area if necessary.  *Id.* at ¶ 4e.

11       Milliman saw plaintiff on November 2, 2004.[1]  Milliman Decl. ¶ 4a.  Milliman assessed

12   plaintiff's right thumb condition as a chronic fungal infection with a chronic secondary bacterial

13   infection.  *Id.* at ¶ 4b.  Milliman prescribed plaintiff an antibiotic ointment, which he expected

14   would resolve any bacterial infection, and also ordered a three-week supply of Band-Aids, which

15   he expected would mitigate any fungal infection.  *Id.* at ¶ 4c.  Milliman held off on prescribing

16   oral anti-fungal medications because they can cause severe reactions in some patients.  *Id.*

17       Based on this evidence, no reasonable jury could return a verdict for plaintiff on his claim

18   that defendants deliberately disregarded his medical condition.  Plaintiff may be critical of the

19   diagnostic choices and treatment options presented, but those differences in opinions do not arise

20   to an Eighth Amendment violation.  *Toguchi,* 391 F.3d at 1057.  The record shows that his

21   condition was not ignored, but rather that the defendants were attempting to treat it.  There is no

22

23       [1]  In his opposing papers, plaintiff states that Milliman also saw him in November 2003,
     looked at plaintiff's swollen and sore thumb, and simply declared, "It's a wart, learn to live with
24   it."  Pl.'s Decl. ¶ 7.  However, plaintiff only alleged a claim of deliberate indifference against
     Milliman based upon their November 2004 visit, and plaintiff's claim is limited to the
25   allegations in his complaint.  *See* Am. Compl. at IV.  Regardless, this evidence, without more,
     would be insufficient to support the necessary inference that, in diagnosing plaintiff's condition
26   as a wart, Milliman knew plaintiff faced a substantial risk of serious harm and consciously
     disregarded that risk.

1   evidence presented that they consciously disregarded his condition.

2          Plaintiff argues that defendants' deliberate indifference is evidenced by the fact that none

3   of them performed a differential diagnosis or collected any culture or biopsy specimen from

4   plaintiff's right thumb to confirm or rule out their diagnoses.  Pl.'s Opp'n (Docket No. 34), Stmt.

5   of Undisp. Facts in Supp. Thereof, ¶¶ 2, 3.  In his declaration, plaintiff refers to a letter from a

6   "staff attorney at the Prison Law Office," which states that an unknown physician thought that

7   the doctor who saw plaintiff in May 2003 did not provide plaintiff with "adequate care" and

8   should have ordered the removal of plaintiff's thumbnail and a biopsy.  Pl.'s Decl. ¶ 13; *see also*

9   Compl. at unnumbered page 58 (letter from Alison Hardy of the Prison Law Office, dated May

10  12, 2005).  Setting aside the double hearsay quality of this information, it does not show that

11  Torruella, the doctor who saw plaintiff in May 2003, knew of and disregarded an excessive risk

12  to plaintiff's health.  It may be that another physician would have ordered a biopsy after the May

13  2003 visit, but any such difference of opinion, without a showing that the course of treatment

14  chosen by Toruella was medically unacceptable and chosen in conscious disregard of an

15  excessive risk to plaintiff's health, is insufficient to establish deliberate indifference.  *See*

16  *Jackson*, 90 F.3d at 332; *Toguchi*, 391 F.3d at 1058.  And even though plaintiff states that the

17  Motrin prescribed to him by Torruella in May 2003 did not alleviate his pain, this also does not

18  suggest that Torruella was deliberately indifferent.  *See* Pl.'s Decl. ¶ 5.  Moreover, there is no

19  evidence that Torruella was ever made aware of the fact that the Motrin did not relieve plaintiff's

20  pain.

21         Plaintiff also submits the declaration of James E. Daly, a retired licensed medical doctor

22  with 35 years of experience in internal medicine, who offers his opinions based on his personal

23  medical training and experience, his review of plaintiff's medical records, and his personal

24  consultation with plaintiff.  Pl.'s Opp'n (Docket No. 34), Decl. of John E. Daly in Supp. Thereof

25  ("Daly Decl.") ¶¶ 1, 3.  It is Daly's opinion that none of the defendants provided "the minimum

26  of standard community medical care" to plaintiff.  *Id.* at ¶¶ 3, 6, 14, 20.  First, Daly states that

1    "[f]rom January 14, 2002 through May 28, 2003, Dr. Torruella knowingly failed to provide

2    proper medical care and standard diagnostic procedures to determine why [plaintiff]'s right

3    thumb lesion continued to deteriorate.  This extended absence of proper medical care of

4    Squamous Cell Cancer is gross medical negligence of a cancer that can, and did, extend locally

5    into adjacent tissue."  *Id.* ¶ 8.  Second, Daly asserts that "Dr. Galloway repeated his colleagues'

6    improper diagnosis without [any] diagnostic testing being done and continued the same

7    ineffective and palliative treatments."  *Id.* ¶ 11.  "Dr. Galloway neither performed or recorded

8    any differential diagnosis or collected any culture or speciman [sic] to confirm his diagnosis or

9    determine the persistent pathology of [plaintiff]'s right thumb; thereby refusing to detect or treat

10   his cancerous growth."  *Id.* ¶ 13.  Third, Daly states that Milliman's "deprivation of pain

11   medication in November 2004, as well as his misdiagnosis and ineffective treatment of

12   metastatic skin cancer are not only professionally undignified and disrespectful, but manifestly

13   consistant [sic] with gross negligence."  *Id.* ¶ 19.

14          It is important to focus on the difference between plaintiff's Eighth Amendment claims

15   and a common law negligence claim for medical malpractice.  While Daly's declaration would

16   undoubtedly be sufficient to establish a genuine issue of fact warranting trial on a claim of

17   medical malpractice, plaintiff's claim is one of cruel and unusual punishment in violation of the

18   Eighth Amendment.  Daly's criticisms of the defendant doctors is that they, in Daly's opinion

19   were negligent and their failure to diagnose the cancer earlier was malpractice.  Daly does not

20   contend that the defendants deliberately chose to disregard plaintiff's conditions.  In Daly's

21   opinion, the failure to diagnose the cause of plaintiff's thumb condition, which had persisted for

22   years, was the result of "gross negligence."  The applicable standard, however, is not gross

23   negligence.  "While poor medical treatment will at a certain point rise to the level of

24   constitutional violation, mere malpractice, or even gross negligence, does not suffice."  *Wood v.*

25   *Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990); *see also Toguchi*, 391 F.3d at 1060-61;

26   *Clement v. Cal. Dep't of Corr.*, 220 F. Supp. 2d 1098, 1105 (2002).  And, while Daly concludes

1   that Torruella "knowingly failed to provide proper medical care" to plaintiff, this particular

2   characterization is wholly unsupported, as his declaration shows at most, what each of the

3   defendants *should have* known or *should have* done.  *See* Daly Decl. ¶ 8.

4        Plaintiff also submits evidence that on June 9, 2006, while awaiting his surgery for the

5   removal of residual cancer cells in his right thumb, Milliman admitted to plaintiff that plaintiff's

6   "surgeries and multiple appointments were quite untimely."  Pl.'s Decl. ¶ 14.  This evidence also

7   fails to support an inference of deliberate indifference.  Even if Milliman recognized that

8   plaintiff's cancer should have been detected at an earlier date, this has no bearing on whether

9   Milliman, or the other defendants, were deliberately indifferent to plaintiff's medical needs when

10  each of them saw plaintiff regarding his thumb condition.   Again, the issue here is not one of

11  medical negligence, but rather, whether the defendants deliberately disregarded plaintiff's

12  condition.

13       In short, the evidence submitted by plaintiff does not suggest that defendants denied,

14  delayed, or intentionally interfered with plaintiff's medical treatment.  *See Hallett v. Morgan*,

15  296 F.3d 732, 744 (9th Cir. 2002).  To the contrary, the record, viewed in the light most

16  favorable to plaintiff, reflects that each defendant was consistently responsive to plaintiff's

17  medical needs.  While plaintiff's evidence suggests that defendants misdiagnosed his thumb

18  condition, it is insufficient to support a valid claim of medical mistreatment under the Eighth

19  Amendment.  *See Toguchi*, 391 F.3d at 1057; *Ruvalcaba v. City of Los Angeles*, 167 F.3d 514,

20  525 (9th Cir. 1999).   Defendants' motion for summary judgment must be granted because

21  plaintiff fails to produce evidence upon which a reasonable fact finder could render a verdict that

22  the defendants actually knew of and disregarded an excessive risk to plaintiff's health and safety.

23       Finally, defendants contend that they are entitled to qualified immunity from plaintiff's

24  deliberate indifference claims.  An official is entitled to qualified immunity unless: (1) the

25  plaintiff alleged facts that show a constitutional violation, and (2) it was clearly established, at

26  the time, that the conduct was unconstitutional.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The

court finds that defendants are entitled to summary judgment on the claim that they violated plaintiff's Eighth Amendment rights, and therefore the court need not address the second prong of qualified immunity.  *See Wilkie v. Robbins*, 127 S. Ct. 2588, 2608 (2007).

**V.    Conclusion**

As to each defendant, plaintiff has failed to demonstrate that there is a genuine issue for trial.  Therefore, defendants' motion for summary judgment must be granted.

Accordingly, IT IS HEREBY RECOMMENDED that defendants' August 7, 2008 motion for summary judgment be granted and that judgment be entered in favor of each defendant.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fifteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated:  August 24, 2009.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE